913 F.2d 1575
 Bankr. L. Rep. P 73,704
In re the CHARTER COMPANY, et al., Debtors.
CHARTER CRUDE OIL COMPANY, Charter International Oil
Company, Plaintiffs-Appellees,
v.
EXXON COMPANY, U.S.A., a DIVISION OF EXXON CORPORATION,
Defendant-Appellant.
 Nos. 89-3419, 89-3607.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 11, 1990.
 
 Hywel Leonard, Alan C. Sundberg, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., for defendant-appellant.
 James H. Post, Raymond R. Magley, Jacksonville, Fla., for plaintiffs-appellees.
 Appeals from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, Chief Circuit Judge, FAY, Circuit Judge, and HOFFMAN*, Senior District Judge.
 FAY, Circuit Judge:
 
 
 1
 Charter Crude Oil Company ("CCOC"), and Charter International Oil Company ("CIOC") (collectively referred to as "Charter"), as debtors-in-possession in bankruptcy, sued Exxon Company, U.S.A. ("Exxon"), a division of Exxon Corporation, to recover amounts owed under several contracts. In a consolidated non-core proceeding, the bankruptcy court, contrary to express contractual setoff provisions, found that Exxon was obligated to pay CCOC the gross balance owed to CCOC, plus eighteen percent interest per annum, and that Exxon was entitled only to an unsecured claim against CCOC for debts owed to Exxon. The district court entered a judgment in favor of Charter, according to the bankruptcy court's proposed findings, and awarded attorneys' fees, even though Charter did not object to the bankruptcy court's failure to recommend such an award. Exxon appeals. We find that the district court erred by entering judgment for the gross amount owed to CCOC without allowing Exxon its legal and contractual right to offset the amount CCOC owed to Exxon. We also find that Exxon must pay only the Texas statutory interest rate of six percent. We therefore reverse the decision of the district court and vacate its award of attorneys' fees.
 
 FACTS
 
 2
 I. The Transactions.
 
 
 3
 This dispute is based upon five "purchase," "sale," and "exchange" contracts, into which Exxon and Charter entered before Charter's petition for bankruptcy. Under purchase or sale contracts, one company buys crude oil ("crude") from the other, and the buyer pays cash to the seller. Under an exchange contract, no cash payment takes place. Instead, the parties agree to an exchange of crude or refined oil products ("product").
 
 
 4
 In 1982, Exxon entered into two purchase contracts for crude (the "060 Contract" and the "062 Contract"), and one matching sale contract for delivery of crude (the "061 Contract") with CCOC. The parties paid for crude delivered under the purchase and sale contracts according to a net settlement agreement. Under that agreement, the amounts owed under all the contracts were netted out on a monthly basis, and a single cash payment was made by the indebted party.[1]
 
 
 5
 In addition to these purchase and sales contracts, there were two exchange agreements between Exxon and Charter (the "052 Contract" and the "236 Contract"). Under the 052 Contract, CCOC agreed to deliver approximately 200 gallons of crude per day to Exxon, and Exxon agreed to deliver an identical amount and kind of crude to CCOC. The 236 Contract, between Exxon and CIOC, operated correspondingly. Under it, CIOC agreed to deliver each month to Exxon certain types and quantities of refined product. In turn, Exxon agreed to deliver to CIOC the identical amount and kind of product it had received.
 
 
 6
 Although the parties ultimately stipulated to the money owed for crude purchased and sold under the 060, 061, and 062 Contracts, as well as the volume of the crude and product imbalances due under the exchange contracts, those amounts were originally in dispute. In fact, the volumes owed under the exchange contracts were not resolved until April, 1985, and even then a dispute regarding certain invoices remained an open issue which was not resolved until shortly before trial.
 
 
 7
 The parties' resolution of the disputed debts and product balances under the purchase, sale, and exchange contracts together with other obligations were set forth in their pre-trial stipulations.[2] As between CCOC and Exxon, Exxon owed a CCOC net debt of $115,721.15, plus 3,328.2 barrels of Texas Sour Crude, which the district court valued at $96,517.80.[3]
 
 
 8
 II. The Bankruptcy.
 
 
 9
 On April 20, 1984, Charter filed for bankruptcy under Chapter 11. On December 18, 1986, upon confirmation of Charter's reorganization plan, Charter filed two adversary proceedings in the bankruptcy court claiming damages against Exxon resulting from the alleged breach of the contracts between the parties. Charter originally styled the proceedings as ones for "turnover" of a debt. The bankruptcy court, however, determined that both disputes were non-core proceedings[4] pursuant to 28 U.S.C. Sec. 157(c)(1) (1988), and consolidated them for trial.
 
 
 10
 At trial, Charter initially acknowledged that Exxon had setoff rights against Charter. Consequently, Charter claimed it was entitled to recover $1,243,671.94, the amount that Charter alleged was the net value of money and product owed to Charter.[5] Additionally, Charter sought interest of eighteen percent on the net CCOC debt and ten percent on the net CIOC debt, totalling $565,382.72.
 
 
 11
 Exxon responded by showing that it had tendered payment to Charter on November 19, 1984 for more than Charter was owed but Charter did not accept the tender. Exxon also asserted that the amounts owed by Charter were a setoff. Charter did not contest the setoff. Further, Exxon claimed that Charter could only receive pre-judgment interest of six percent on all net accounts as a matter of law.
 
 
 12
 After trial, the bankruptcy court submitted to the district court its proposed findings of fact and conclusions of law in each of the non-core proceedings, pursuant to 28 U.S.C. Sec. 157(c)(1) (1988). The bankruptcy court made several recommendations. First, it recommended that CCOC recover from Exxon under the 052 Contract the gross amount of product owed to it ($96,517.80) plus six percent pre-judgment interest. Second, it recommended that Exxon pay CCOC the gross amount it owed under the 060 and 062 Contracts ($1,670,842.61) plus eighteen percent interest. Third, it recommended that Exxon pay CIOC the net amount it owed to CIOC ($1,031,432.65) plus six percent interest. As for debts owed to Exxon, the bankruptcy court recommended that Exxon have an unsecured claim of $1,431,173.53 against Charter (the amount owed to Exxon by CCOC under the 061 Contract) with no interest to accrue. Finally, the bankruptcy court recommended that Exxon's November 19th tender of payment was invalid because it was conditioned upon bankruptcy court approval.
 
 
 13
 The bankruptcy court's proposed findings for CCOC made no mention of the net settlement agreement which provided for a net basis of settlement of payment obligations. Additionally, the proposed findings failed to offset undisputed debts owed by CCOC to Exxon against Exxon's debts to CCOC. The court made its recommendation despite CCOC's own offered proposed findings which provided for such a setoff. Curiously, the bankruptcy court's proposed findings regarding CIOC offset debts between CIOC and Exxon and netted them out before awarding any interest to CIOC.
 
 
 14
 III. The District Court's Determination.
 
 
 15
 On November 2, 1988, Exxon submitted objections to the bankruptcy court's proposed findings and requested de novo review by the district court under 28 U.S.C. Sec. 157(c)(1) (1988). On April 20, 1989, the district court entered an opinion and final judgment in favor of Charter. 103 B.R. 302.
 
 
 16
 The district court adopted many of the proposed findings of the bankruptcy court and held in favor of Charter. It refused to enforce Exxon's right of setoff under Section 553 of the Bankruptcy Code.[6] Instead, it ruled that Exxon had violated the automatic stay of 11 U.S.C. Sec. 362 (1988) by failing to make payments and deliver product to CCOC without prior court approval. Additionally, the court held that Exxon had waived its setoff by not obtaining court approval prior to confirmation of CCOC's plan of reorganization. Because of Exxon's waiver, the court rejected Exxon's claim that CCOC's concessions throughout trial and post-trial entitled Exxon to setoff. The court also rejected Exxon's argument that the net settlement agreement entitled Exxon to setoff. It believed that enforcing the net settlement agreement would violate the automatic stay.
 
 
 17
 The district court then concluded that CCOC was entitled to an award of eighteen percent interest on the 060 and 062 Contracts. Yet, the contracts were silent as to any interest to be paid, and Exxon had never paid any interest under them to CCOC. Exxon claimed that in such situations the Texas statutory maximum interest rate is six percent. The court based its assessment of eighteen percent upon a printed phrase on CCOC's invoices that were sent after delivery that "interest at the maximum lawful rate will be charged on past-due amounts."[7]
 
 
 18
 Finally, the district court rejected Exxon's argument that Charter had waived any right to seek attorneys' fees. Because we reverse in this case upon other grounds, we do not address this issue.
 
 ANALYSIS
 
 19
 I. The Setoff.
 
 
 20
 We find it unnecessary to engage in a detailed discussion of either the automatic stay provision[8] or of Section 553 of the Bankruptcy Code. It is clear to us that the undisputed terms of the contractual arrangement between the parties control. Exxon and CCOC had agreed to and operated in accord with their net settlement agreement and on no other basis.
 
 
 21
 The net settlement agreement clearly applied to the 060, 061, and 062 Contracts while they were in effect. By its express terms, Exxon was obligated only to pay CCOC the net balance of the parties' mutual invoices on a monthly basis.
 
 
 22
 Charter argues that because the cancellation of the contracts terminated the net settlement agreement, the net settlement agreement no longer applies to debts owed under those contracts. Certainly, the net settlement agreement would not apply to any future transactions between the parties. Yet, we see no reason why the net settlement agreement should not be given full effect as to past transactions already consummated under the contracts. Both parties agree that the net settlement agreement was in effect throughout the time that Exxon and CCOC conducted those transactions under the contracts, therefore its terms dictate.
 
 
 23
 Charter, by its own admission, sought only the net amount owed under the contracts. The parties operated according to and with knowledge of this net settlement agreement for years. Charter even submitted a proposed "Final Judgment and Order Authorizing Exxon to Setoff Prepetition Debts Against CCOC" to the bankruptcy court before the court proposed that Charter receive the gross balance due from Exxon.
 
 
 24
 However, the district court believed that enforcing the net settlement agreement would violate the automatic stay provision. The automatic stay prohibits interference with the debtor's property. 11 U.S.C. Sec. 362 (1988). This case does not concern issues of withholding property of the debtor. Instead, this case involves a state law contractual dispute, a non-core proceeding.
 
 
 25
 Turnover proceedings are not to be used to liquidate disputed contract claims. In re Chick Smith Ford, Inc., 46 B.R. 515, 518 (Bankr.M.D.Fla.1985). Clearly, Congress envisioned the turnover provision of Sec. 542 of the Code, 11 U.S.C. Sec. 542 (1988), to apply to tangible property and money due to the debtor without dispute which are fully matured and payable on demand. See United States v. Whiting Pools, Inc., 462 U.S. 198, 202-03, 103 S.Ct. 2309, 2312-13, 76 L.Ed.2d 515 (1983); In re Chick Smith Ford, 46 B.R. at 518. Congress intended to ease reorganization by allowing the debtor to obtain funds immediately necessary for survival--not all funds, only those not in dispute. In re Chick Smith Ford, 46 B.R. at 518; see, e.g., In re Archer, 34 B.R. 28 (Bankr.N.D.Tex.1983) (fully liquidated and undisputed bank deposits to be offset against outstanding loan); see also In re Welch, 29 B.R. 819 (Bankr.M.D.Tenn.1982). The bankruptcy court correctly determined that the dispute between Exxon and Charter was a non-core proceeding; that is, the amount of funds owed according to the net settlement agreement and under the contracts was in dispute. To apply turnover principles to the dispute between Exxon and CCOC would allow CCOC to recover monies under the Bankruptcy Code from disputed claims based strictly on state law.[9] "Certainly such procedure could not be sanctioned outside bankruptcy and there is no just reason why it should be sanctioned just because the entity seeking to collect disputed funds happens to be a Debtor under the Bankruptcy Code." In re Chick Smith Ford, 46 B.R. at 518. The bankruptcy court conclusively determined, and CCOC did not challenge its determination, that CCOC's claims against Exxon involved only non-core, state law contract claims. This case presents only issues of state contract law. The fact that the parties ultimately agreed on the sum due does not change this situation. Therefore, CCOC had no claim for turnover of property.
 
 
 26
 It is interesting to note that if no breach had occurred under these contracts, CCOC would have only been entitled to receive the net amount owed on the invoices. Damages for breach of contract should not put a plaintiff in a better position than if there had been no breach. Blanton v. Mobil Oil Corp., 721 F.2d 1207, 1217 (9th Cir.1983); Manganaro Bros., Inc. v. Gevin Constr., 610 F.2d 23, 24 (1st Cir.1979); see Plantation Key Developers v. Colonial Mortg. Co. of Indiana, 589 F.2d 164, 169 (5th Cir.1979)[10]. To hold for Charter in this case would put it in a better position than if no breach had occurred. The terms of the net settlement agreement expressly apply and limit each party's rights to the net amount owed under all the contracts. Therefore, we REVERSE the decision of the district court with respect to the 060, 061, and 062 Contracts and hold that Exxon must pay CCOC the net amount owed to CCOC under those contracts.
 
 
 27
 II. The Interest.
 
 
 28
 This case involves a contract dispute under the laws of Texas. In Texas, if parties make no agreement as to a specific interest rate, the statutory rate of six percent per annum is read into the agreement, and constitutes the maximum interest rate allowable on the transaction.[11] Triton Oil & Gas v. Marine Contractors & Supply, 644 S.W.2d 443, 445 (Tex.1982) (citations omitted); Preston Farm & Ranch Supply v. Bio-Zyme Enterprises, 625 S.W.2d 295, 297 (Tex.1981); Houston Sash & Door v. Heaner, 577 S.W.2d 217, 221 (Tex.1979). The issue before us in this case is whether the parties ever agreed to an interest rate.
 
 
 29
 According to the evidence presented to the bankruptcy court and district court, no mention of interest charges was ever made in the purchase, sale, or exchange contracts between Exxon and Charter, or in the net settlement agreement between Exxon and CCOC. The only evidence of an agreement to interest that CCOC offered was the interest-charging invoices which it sent to Exxon following delivery of crude under the 060 and 062 Contracts. CCOC asserts that because Exxon failed to question or object to the provision on the invoices Exxon implicitly agreed to the interest charges through its course of conduct.
 
 
 30
 The Texas Supreme Court has addressed this issue. Triton Oil, 644 S.W.2d 443 (Tex.1982); Preston Farm, 625 S.W.2d 295 (Tex.1981). In Preston Farm, the court held that an implied agreement to pay interest charges arose where one party inserted a service charge provision on invoices on an open account. Preston Farm, 625 S.W.2d at 298. The other party did not object to these charges, and it continued to make payments and purchases on the account. Id. In Triton Oil, the court refused to find an agreement to pay interest charges where such charges were placed on an invoice, without objection, and where the charging party unilaterally deducted the interest charges from the other party's share of certain proceeds. Triton Oil, 644 S.W.2d at 445-46.
 
 
 31
 CCOC relies upon Preston Farm for the proposition that based upon the course of conduct between the parties, Exxon "knew or should have known that the service charge was being imposed. By [Exxon's] continued purchases and payments [Exxon] at least impliedly agreed to pay the specified interest." Preston Farm, 625 S.W.2d at 298. Exxon, on the other hand, claims that the invoices which were sent after delivery of the crude could only serve "as billing [statements] to show ... the total amount owed[;] [t]he basic contract for the sale of goods had already been formed and executed." 625 S.W.2d at 299. According to Exxon, Preston Farm was decided on the fact that the party in question actually paid service charges, did not object to them, and even admitted that "he agreed with the charges to his account until 'very, very, recently' when he found out too much interest was being charged." 625 S.W.2d at 298 (emphasis added). "[T]he mere failure to object within a reasonable time [to charges on the invoices], without more [e.g., payment], would not ... establish an agreement" to pay interest. 625 S.W.2d at 300.
 
 
 32
 Exxon also argues that the Texas Supreme Court in Triton Oil interpreted Preston Farm to require actual payment of interest in order to infer such an agreement. In Triton Oil, the court, discussing Preston Farm, said, "Preston Farm did not complain of the interest charges, but did, however continue making ... payments on the account. We held that continued payments ... after receipt of the interest-charging invoices constituted evidence of an agreement to pay interest." Triton Oil, 644 S.W.2d at 445 (citations omitted). The court went on to say that the "unilateral act[ ] of charging interest on ... invoices [is] not evidence of an agreement.... While it is true that Marine never complained of the interest charges, Marine also never paid them." Id. at 444-45 (emphasis added).[12]
 
 
 33
 The case before us is clearer than either Triton Oil or Preston Farm. Exxon's required payments are not based on the invoices containing the interest provision, as the district court believed, but instead based upon the agreements from which its duty to pay arose initially--the 060 and 062 Contracts coupled with the net settlement agreement. These written agreements, which contained non-interest charging alternatives for late payment, were silent as to interest charges. No evidence was offered that Exxon or CCOC had ever paid any interest to each other, or that prior to the bankruptcy of CCOC either had even suggested the payment of such. No agreement to pay interest at any rate ever existed between Exxon and CCOC. Further, the invoices in question were used only as bookkeeping entries for products delivered under the purchase and sale contracts. Accordingly, we REVERSE the district court with respect to interest charges on the 060 and 062 Contracts and hold that Exxon must pay the statutory six percent per annum rate of interest on the net amount owed to CCOC under the 060, 061, and 062 Contracts.
 
 
 34
 III. Attorneys' Fees.
 
 
 35
 Because we reverse the district court's decision as to setoff and interest, we hereby VACATE the district court's award of attorneys' fees, 103 B.R. 310.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The Net Settlement Agreement established a credit balance arrangement between CCOC and Exxon covering payments due for crude and product sold and exchanged each month under all the contracts between the parties. It provided, in part:
 1[/2*]. For each calendar month in which transactions occur (the transaction month), the sales prices for crude oil and/or condensate sold to Charter [/Exxon] and the exchange differentials, if any, due Exxon [/Charter] under such agreements and division orders shall be determined according to the respective pricing provisions contained therein, and a total "payable to Exxon" [/"payable to Charter"] amount obtained.
 
 
 [3]
 The parties shall continue to issue invoices to each other in the normal course of business. On the 19th day ... of the month following the transaction month, each company will confer by telephone and compare/confirm invoiced amounts "payable to Exxon" and "payable to Charter." Any difference (the "net settlement" of account balances) resulting after comparing the total value "payable to Exxon" under Number 1, above to the total value "payable to Charter under Number 2, above shall be paid for by the party hereto receiving the greater value to the party hereto receiving the lesser value by wire transfer of immediately available funds on the 20th day ... of the month following the month of transaction
 ....
 Purchase, sale and exchange agreements entered into between the parties hereto after the date hereof, shall also be subject to this net settlement agreement unless it is otherwise mutually agreed in writing.
 [*Paragraphs 1 and 2 are reciprocal provisions. Bracketed terms [/xxx] refer to the terms in paragraph 2.]
 (Plaintiff's exhibit 18.)
 
 
 [2]
 The parties introduced into evidence at trial the following joint stipulation which summarized the debts and product balances owing between CCOC and Exxon:
 CCOC/EXXON
 Termin. Pre-Petition Post-Petition Pre-Petition
 K Date Due CCOC Due CCOC Due Exxon
052 3/1/83 $ 96,517.80 [ ] ---- ----
060 5/1/84 $1,245,579.11 $45,984.29 ----
061 5/1/84 ---- ---- $1,431,173.53
062 7/1/84 $ 375,387.17 $ 3,892.04 ----
N/A ---- ---- ---- $ 90,448.93
N/A ---- ---- ---- $ 33,500.00
 ------------- ------------- -------------
Total** $1,717,484.08 $49,876.33 $1,555,122.46
 ------------- ------------- -------------
 ------------- ------------- -------------
 ....
 
 
 **
 The total amounts exclude interest allowed by law
 (Joint exhibit 2.)
 
 
 [3]
 This amount is based on the market value of the crude under the Exchange Contract 052 as of March 1, 1983, the date ultimately adopted by the district court for valuation
 
 
 [4]
 Non-core proceedings deal with non-bankruptcy, state law claims collateral to a bankruptcy. See generally 28 U.S.C. Sec. 157 (1988) (enumerating what constitutes "core" proceedings)
 
 
 [5]
 The sum of the claims for net balances due Charter: CIOC ($1,031,433.09), CCOC ($212,238.95)
 
 
 [6]
 11 U.S.C. Sec. 553 (1988)
 
 
 [7]
 Although the maximum rate was as high as twenty-one percent, CCOC stipulated to the eighteen percent rate
 
 
 [8]
 11 U.S.C. Sec. 362 (1988)
 
 
 [9]
 Texas law is applicable under the facts of this case
 
 
 [10]
 The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [11]
 Article 5069-1.03 provides, "When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable." Tex.Rev.Civ.Stat.Ann. art. 5069-1.03 (Vernon 1979)
 
 
 [12]
 Following Triton Oil, the Texas Supreme Court has not dealt with the issue specifically. However, several appellate courts in Texas have reached the issue. In Industrial Disposal Supply v. Perryman Brothers Trash Service, 664 S.W.2d 756, 765-66 (Tex.App.--San Antonio 1983), the court appeared to interpret Preston Farm to require actual payment of interest charges in order for an agreement to be found:
 In finding evidence of a course of conduct giving rise to an agreement to pay interest, the [c]ourt recognized that the parties had extensive dealings with each other, that the monthly statements contained a service charge provision, that credit purchases continued with full knowledge of the service charge provision, that no objection to the service charge was ever made and that service charges were in fact paid.
 Id. at 765 (citing Preston Farm, 625 S.W.2d at 298.) (emphasis added). Additionally, the court noted that Triton Oil held that the buyer's failure to object to interest charges placed on invoices "does not establish an agreement between the parties where the buyer did not pay the interest charged." Id. at 766 (citing Triton Oil, 644 S.W.2d at 445-46) (emphasis in original). The Industrial Disposal court agreed with Triton Oil and believed it to be in "complete harmony with the holding in Preston Farm." Id.
 In Amarillo Equity Investors v. Craycroft Lacy Partners, 654 S.W.2d 28 (Tex.App.--Ft. Worth 1983), another appellate court adopted the same interpretation of the issue. Id. at 30-31. "Mere payment of part of the amount due on the accounts is not evidence of such an acceptance [of interest charges on invoices]. While it is true that Amarillo Equity never complained of the interest charges, there is also no evidence to show that they ever paid them." Id. at 31 (citing Triton Oil, 644 S.W.2d at 445; Preston Farm, 625 S.W.2d 295) (emphasis added).
 Charter and the district court point to Delta (Delaware) Petroleum & Energy v. Houston Fishing Tools, 670 S.W.2d 295 (Tex.App.--Houston [1st Dist.] 1983), and United States ex rel. Canion v. Randall & Blake, 817 F.2d 1188 (5th Cir.1987), to support a finding of an agreement absent actual payment of interest. Although in the case before us we decline to set out a broad standard requiring payment of interest to show such an agreement, with respect to the contracts between Exxon and CCOC we find that no such agreement existed based solely on CCOC's invoices.