In re OLYMPIA HOLDING CORPO-
RATION, a/k/a P*I*E Nation-
wide, Inc., et al., Debtors.

Lloyd T. WHITAKER, as Trustee of
Olympia Holding Corporation,
Debtor, Plaintiff,

v.

NATIONAL CITY BANK OF COLUM-
BUS, as successor in interest to Banc-
Ohio National Bank, Defendant.

Bankruptcy Nos. 90–4195–
3P7 and 90–4223–3P7.
Adversary No. 96–542.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

June 22, 1998.

Chanley Howell and John Cole, Jackson-
ville, FL, for Plaintiff.

Betsy Cox Mahin and Adrian Rust, Jack-
sonville, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy
Judge.

This proceeding is before the Court upon
Complaint filed by Trustee Lloyd T. Whit-

aker ("Plaintiff") which seeks turnover of property of the estate of Olympia Holding Corporation, a/k/a P*I*E Nationwide, Inc. ("Debtor") pursuant to 11 U.S.C. § 542(a). A trial was conducted on March 4, 1998, and April 1, 1998, and based upon the evidence presented the Court enters the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1. In February, 1987, Debtor purchased a certificate of deposit in the amount of $500,-000 from National City Bank of Columbus' predecessor ("Defendant").

2. In the years following 1987 Defendant issued a series of similar certificates of deposit to Debtor.

3. The certificates of deposit served as collateral to guarantee workers' compensation claims against the debtor in the state of Ohio.

4. The arrangement between the debtor and the Ohio Bureau of Workers' Compensation ("Bureau") regarding the certificates of deposit was structured as follows:

Debtor assigned each certificate to the Bureau as it was issued. (March 4, 1998 Tr. at 106.) Bill Lawrence, a banking officer and assistant branch manager of Defendant until 1994, personally delivered the certificates to the Bureau following issuance. (April 1, 1998 Tr. at 9.) The State retained physical possession of each certificate until maturity, while the $500,000 remained on deposit with Defendant. (March 4, 1998 Tr. at 105; April 1, 1998 Tr. at 9.) Each certificate had a specific term and was nonrenewable. (April 1, 1998 Tr. at 55.) Upon maturity, Defendant issued a new certificate of deposit, a new assignment was executed, and Lawrence exchanged the new certificate for the old. (March 4, 1998 Tr. at 106; April 1, 1998 Tr. at 7.) Defendant remitted interest on the certificates to the Debtor. (March 4, 1998 Tr. at 10.)

5. Defendant issued the final certificate of deposit to Debtor on August 23, 1990 ("the CD"). (Pl.Ex. 1.) The CD had a 180 day term with a maturity date of February 19, 1991. (Id.)

6. The CD, as was common for the certificates issued to the debtor by Defendant, states on its face that: "This Time Deposit shall be payable upon presentation and surrender of this certificate on the maturity date provided above. This certificate is not negotiable or assignable. Interest will be paid during the term at the per annum rate provided herein." (Id.) The following language then appears in bold print: "This certificate is not automatically renewable at maturity and no interest shall be payable after maturity." (Id.)

7. Debtor filed a chapter 11 petition on October 16, 1990, and Plaintiff was appointed Trustee.

8. Defendant mailed system-generated notices seven to ten days prior to the maturity date of certificates of deposit in order to notify its customers of the upcoming maturity of a certificate. (April 1, 1998 Tr. at 63.)

9. On February 19, 1991, the CD's maturity date, Defendant paid the debtor interest earned on the CD in the amount of $19,875. (Def. Trial Br. at 5.)

10. Debtor's case was converted to Chapter 7 on March 11, 1991, and Plaintiff, the Chapter 11 Trustee, was appointed the Chapter 7 Trustee.

11. Following the maturity of the CD Defendant transferred Debtor's $500,000 deposit from a certificate of deposit account to a demand deposit account. (April 1, 1998 Tr. at 16.) Demand deposit accounts are non-interest bearing accounts. (Id.)

12. On May 24, 1996 Defendant sent Debtor an escheat notice informing the Debtor that its $500,00 was still on deposit. (Pl. Ex. 8.) The notice further provided that due to inactivity for a period of five years the funds would escheat to the state if they remained unclaimed. (Id.)

13. Subsequent to his receipt of the escheat notice the Plaintiff contacted Defendant and provided the documentation necessary to establish his authority to receive the funds. (March 4, 1998 Tr. at 26.)

14. Defendant sent Plaintiff a cashier's check for $500,000 on June 13, 1996, (April 1,

1998 Tr. at 62), which he received on June 20, 1996. (Pl. Trial Br. at 17.)

15. After receiving the check for $500,000 Plaintiff made a demand on the defendant for interest on the $500,000 for the five years the funds remained in a non-interest bearing account. (March 4, 1998 Tr. at 29.)

16. . Defendant refused to pay interest and Plaintiff filed this proceeding on October 23, 1996. (*Id.*)

17. At trial both parties presented testimony purporting to explain Defendant's possession of the $500,000 for over five years after the maturity of the CD.

18. Barbara Tompkins, an employee in Debtor's treasury department during the relevant time period, testified that she was involved in the purchase of the initial certificate of deposit in 1987, as well as the requests for the issuance of subsequent certificates. (March 4, 1998 Tr. at 104 *passim.*) Tompkins further testified that she received maturity notices for the certificates and that it was a common practice for her to talk with Lawrence around the time of the certificates' maturity. (*Id.* at 107, 110.)

19. On February 1, 1991, Larry Eckert was appointed treasurer and assumed Tompkins' responsibilities concerning the certificates. (*Id.* at 8–9.)

20. Lawrence corroborated Tompkins' testimony and testified that following maturity of the certificates he contacted Debtor concerning their renewal. (April 1, 1998 Tr. at 7–8.) As far as Lawrence can recall, he spoke with Tompkins when he called Debtor following the maturity of the CD. (*Id.* at 13.)

21. Lawrence learned of Debtor's bankruptcy filing after February, 1991. (*Id.* at 13, 27–28.)

22. After not hearing from Debtor regarding the renewal or cashing in of the CD Lawrence advised Defendant's legal department of the situation with the CD. (*Id.* at 18.)

23. Lawrence also contacted the Bureau to find out how the CD was being handled from its standpoint. (*Id.*) Lawrence spoke with Larry Rhodebeck, an attorney with the Bureau. (*Id.* at 19.)

24. Lawrence also spoke with Robert Doty, an Assistant Attorney General for Ohio, several times regarding the CD. (*Id.* at 19–20.)

25. Eckert, who assumed the CD was automatically renewing, expected an interest payment to be made in August, 1991. (March 4, 1998 Tr. at 16.) On September 25, 1991, after no interest payment had arrived, Eckert wrote a letter to Lawrence. (Pl.Ex. 4.) The letter requested information on whether the CD was rolled over, the interest rate, the maturity date, and earned interest distribution. (*Id.*)

26. Lawrence responded to Eckert's letter on October 1, 1991. (Pl.Ex. 5.) Lawrence wrote Eckert that the CD was being held by the Bureau, and that the disposition of the CD was in the hands of Robert Doty. (*Id.*) He provided Eckert with Doty's address and phone number, and told Eckert to contact Doty for further details on the CD. (*Id.*)

27. Eckert interpreted Lawrence's letter to mean that the $500,000 on deposit with Defendant had been turned over to the Bureau. (March 4, 1998 Tr. at 21.) Eckert testified that because he was an officer of Debtor who had written to the defendant and because his questions in the letter had not been answered, he assumed the Bureau had redeemed their collateral. (*Id.* at 21, 22 .) This did not surprise Eckert because he was aware of outstanding workers' compensation claims in the state of Ohio in excess of $500,-000. (*Id.* at 21, 23.) He therefore assumed the Bureau was paying injured employees with the funds from the CD. (*Id.* at 21.)

28. Eckert had not looked at Tompkins' file on the certificates of deposit or the CD itself prior to the time he made the assumption that the CD would be automatically renewed. (*Id.* at 54, 62.) Eckert also had not spoken with Tompkins regarding the CD. (*Id.* at 54.) Eckert admitted that his assumption that the CD was automatically renewable was contrary to the CD and the information in the file. (*Id.* at 65.)

29. Regarding his response to Eckert's letter, Lawrence testified that when he wrote that the CD was being held by the Bureau he was referring to the certificate (the piece of

paper) itself. (April 1, 1998 Tr. at 23.) Lawrence stated that the term "disposition" in his letter signified that Doty had the power to dispose of the certificate and was the gentleman he felt Eckert should speak to. (*Id.* at 23–24.) Lawrence further testified that he did not know who was entitled to the money but that Defendant wanted to get rid of the money because it was not a normal procedure to have it on deposit. (*Id.* at 24.) Lawrence also testified that he felt the defendant was in a neutral position and that the real parties in interest were the Bureau and Debtor. (*Id.* at 18.)

30. Following the exchange of correspondence between Eckert and Lawrence in September and October, 1991, there was no further contact between Debtor and Defendant regarding the $500,000 on deposit until the escheat notice was mailed in May, 1996.

### Conclusions of Law

■ Plaintiff asserts that Eckert was misled into believing the $500,000 was no longer on deposit with the defendant by Lawrence's October, 1991 letter. Consequently, Plaintiff argues that Eckert's failure to demand the return of the funds was caused by the defendant, and the plaintiff should be awarded an amount of money equivalent to the interest that could have been earned if the funds had been retrieved at maturity in February, 1991. Pursuant to theories of negligent misrepresentation and unjust enrichment the plaintiff seeks (1) the turnover of $148,572 for the loss of interest suffered during the relevant time period; (2) prejudgment interest in the amount of $12,633.17 to compensate Plaintiff

for the loss of the use of the $148,572 in interest; and (3) taxable costs and attorneys' fees.

■ 11 U.S.C. § 542 requires entities in possession of property of the estate and entities which owe a debt that is property of the estate to turn over such property and debt to the trustee.[1] 11 U.S.C. § 542(a), (b) (1998). The turnover provision provided by § 542 applies to "tangible property and money due to the debtor without dispute which are fully matured and payable on demand." *Charter Crude Oil Co. v. Exxon Co., U.S.A. (In re Charter Co.),* 913 F.2d 1575, 1579 (11th Cir. 1990). *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Section 542 is not an available remedy for a party seeking to liquidate a disputed contract claim. *In re Charter Co.,* 913 F.2d at 1579. Moreover, the purpose of the turnover provision is to provide debtors with the ability to recover property, not the ability to recover property which *may be owed* to debtors. *Ven–Mar of Indian River, Inc. v. Hancock (In re Ven–Mar Int'l, Inc.),* 166 B.R. 191, 193 (Bankr.S.D.Fla.1994) (emphasis added).

In order to determine whether the plaintiff is entitled to the turnover of interest which could have been earned on the $500,000 deposit the Court must proceed in accordance with § 542. Pursuant to the turnover provision the trustee is entitled to have property of the estate turned over.[2] 11 U.S.C. §§ 542(a), 363(b)(1) (1998). Therefore, the Court will consider whether the defendant is in possession of property of the estate which it is required to release to the plaintiff.[3]

---

1. 11 U.S.C. § 542(a) and (b) specifically provide as follows:

    (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

    (b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee,

except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(a), (b) (1998).

2. "Property of the estate" is defined by the Bankruptcy Code as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1998).

3. The parties have thoroughly briefed various issues in the post-trial briefs submitted at the Court's request. However, the Court interprets this proceeding as involving the simple question of whether the trustee is entitled to turnover under § 542. Because the trustee is entitled to turnover of property of the estate pursuant to

As of October 16, 1990, the petition date, the defendant was in possession of $500,000 which admittedly belonged to the debtor. (Def. Trial Br. at 53; April 1, 1998 Tr. at 16.) However, that sum was previously relinquished by Defendant to the plaintiff upon his request. Moreover, on February 19, 1991, the defendant paid the estate $19,875, the interest due on the CD, as required. Therefore, those funds are also no longer available for turnover.

In addition to the sums described above the plaintiff suggests that the interest which he could have earned on the $500,000 if it had been turned over immediately following maturity of the CD is property of the estate which must now be turned over. The plaintiff asserts that the value of the $500,000 deposit to the estate includes the interest which could have been earned; therefore, Plaintiff concludes that the interest is also property of the estate. The Court finds, however, that any interest which could have been earned, or which was actually earned by Defendant, is not property of the estate. The contract [4] between the defendant and the debtor explicitly provides that no interest is payable after the maturity of the CD. Therefore, the debtor has never been entitled to any interest. The defendant is only required to turn over actual "property of the estate" and something to which the debtor has never been entitled cannot be considered "property of the estate". The Court finds that according to the plain language on the face of the CD the "value" of the $500,000 is $500,000, not $500,000 plus interest. *See* Pl. Ex. 1 ("and no interest shall be payable after maturity.").

Even when the language on the certificate is disregarded the Court finds that Defendant is not required to turn over the "value" of the $500,000. Section 542 requires an entity to turn over the property *or* the value of such property. 11 U.S.C. § 542(a) (1998) (emphasis added). The Court construes this section to require the turnover of the property itself if the property is still in the entity's possession. The use of the conjunction "or" denotes the requirement that an entity return the value of the property only if the property itself is no longer in the entity's possession. *See Boyer v. Davis (In re U.S.A. Diversified Products, Inc.)*, 193 B.R. 868, 875 (Bankr.N.D.Ind.1995) ("Furthermore, if a lack of present possession, ... constituted sufficient compliance [with § 542(a)], little, if any, purpose would be served by the statutory alternative of requiring delivery of 'the value of such property.' "), *aff'd*, 196 B.R. 801 (N.D.Ind.1996), *aff'd*, 100 F.3d 53 (7th Cir.1996). Because Defendant remitted $500,000 to the plaintiff it is not required to remit some hypothetical additional "value" of the $500,000.

The Court also rejects Plaintiff's request for relief to the extent that Plaintiff argues he is entitled to interest based upon negligent misrepresentation and unjust enrichment. Any such relief would require the Court to alter the parties' rights under an agreement presumably voluntarily entered into by both Debtor and Defendant. The Court refuses to modify a contract, or to alter a party's rights under that contract, on equitable grounds simply because Plaintiff is now dissatisfied with the terms of Debtor's agreement.

### Conclusion

The Court holds that the plaintiff is not entitled to turnover of interest he could have earned on the $500,000 deposit because any such interest does not qualify as property of the estate as required by § 542. Consequently, Plaintiff's request for prejudgment interests, costs, and attorney's fees is also denied. A judgment in accordance with these findings of fact and conclusions of law will be separately entered.

§ 542, the Court's task is to determine what property exists, if any, which must be turned over.

4. The contract is the actual certificate of deposit which includes the terms of the agreement between Debtor and Defendant on the front and reverse sides of the certificate. *See* Pl.Ex. 1.