**In re SUNCOAST TOWERS EAST ASSOCIATES, a Florida general partnership, Debtor.**

**Bankruptcy No. 98–41673–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida, Miami Division.

Oct. 27, 1999.

reach the question here, the Debtor's estoppel theory probably would not work against any creditor.

Patricia A. Redmond, Stearns, Weaver, Miller, Weissler, Alhadeff ETAL, Miami, FL, for debtor.

Michael Hyman, Hyman & Kapla, Miami, FL, for Meruelo.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING MERUELO'S MOTION FOR REIMBURSEMENT OF "EARNEST MONEY" (C.P.568)

A. JAY CRISTOL, Bankruptcy Judge.

On July 17, 1999, this Court held an evidentiary hearing on *Homero Meruelo's And Belinda Meruelo's Motion For Reimbursement Of "Earnest Money" Pursuant To Homero Meruelo's And Belinda Meruelo's Incorporated Request For The Recission Of The Auction Real Estate Contract* ("Motion") (C.P.568). After careful review and consideration of (a) the exhibits and other evidence presented by the parties, (b) the demeanor, credibility and relevance of the testimony given by the witnesses, and (c) the record in this bankruptcy case, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. General Background And Nature Of Dispute

The Debtor is a Florida general partnership and the developer of a high rise condominium conversion project known as the "Seacoast Towers East" located at 5151 Collins Avenue, Miami Beach, Florida ("Building"). On August 16, 1995, as part of its development of the Building, the Debtor filed a Declaration Of Condominium. The Declaration of Condominium formed the Seacoast 5151 Condominium.

### B. The Bankruptcy Case

On December 7, 1998 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"). On the Petition Date, the Debtor owned certain property and improvements located within the Building. From the Petition Date through approximately July 9, 1999,[1] the Debtor operated and managed its business and affairs as debtor-in-possession pursuant to §§ 1107 and 1108 of the Code.

### C. The Sale To Meruelo

On April 22, 1999, the Court held a hearing on the *Debtor's Motion To (A) Authorize Sale Of Certain Condominium Units [to be held on May 14, 1999] And Commercial Space, (B) Approve Buyer's Premium, And (C) Approve Sale Procedures* ("Sale Motion"). In the Sale Motion, the Debtor sought authority to conduct an in-court auction sale of certain property, including:

a) commercial spaces that on the Petition Date were "limited common element" spaces appurtenant to condominium unit 431, and which were to be converted prior to any closing on the sale to commercial condominium units CU 1, CU 2, CU 3, CU 4, CU 5 and CU 6 ("Commercial Units");

b) ten (10) outdoor parking spaces associated with the commercial units set forth in (a), and thirteen (13) additional outdoor parking spaces (collectively "Parking Spaces");

c) Debtor's interest in the remaining unassigned boat slips ("Boat Slips"); and

d) Debtor's interest, if any, in the Tiki and Lobby Bars ("Intangibles").

On April 30, 1999, the Court entered an Order approving the Sale Motion and

---

1. During the bankruptcy case, Debtor sold all of its property pursuant to § 363 of the Code and, in accordance with Florida law, turned over control to the Seacoast 5151 Condominium Association, Inc. ("Association") on July 9, 1999. *See, e.g., Florida Statutes §§ 718 et. seq.*

scheduling an in-court auction for May 12, 1999. The Order approving the Sale Motion notified all parties in interest that the Commercial Units, Parking Spaces, Boat Slips, and Intangibles (collectively "Sale Property") were to be created by "unbundling" condominium unit 431. The "unbundling" of condominium unit 431 was to be accomplished by the Sixth Amendment to the Declaration of Condominium[2] ("Sixth Amendment").

On May 12, 1999, the Court held an auction sale of the Sale Property and various parties appeared and entered bids. Before the auction began, prospective purchasers were informed that the Sale Property would be created by the subsequent filing of the Sixth Amendment. Further, before the auction, prospective purchasers were given a prospectus concerning the location and nature of the Sale Property, and a copy of the survey to be appended to the Sixth Amendment. At the conclusion of the bidding, the Court found that Meruelo had cast the highest and best bid for the Sale Property in the amount of $825,-000.00, plus a 6% buyer's premium. Upon being declared the successful bidder, Meruelo signed a contract to purchase the Sale Property and posted a deposit in the amount of $200,000 ("Escrow Deposit"). The purpose of the Escrow Deposit was to provide liquidated damages to the Debtor in the event that Meruelo failed or refused to close on the Sale Property. Thereafter, on June 11, 1999, the Court entered its *Order Confirming Sale of Certain Commercial Units, Boat Slips And Parking Spaces And Retaining Jurisdiction to Implement The Terms And Conditions of Sale.* The Confirmation Order was not appealed and is now a final order.

## D. *The Sixth Amendment to Declaration of Condominium*

On June 21, 1999, the Debtor filed its Sixth Amendment which legally created the Sale Property. Upon filing the Sixth Amendment, the Debtor was prepared to close on the contract to sell the Sale Property to Meruelo.

However, on June 28, 1999, within fifteen days of Meruelo's receipt of the Sixth Amendment, Meruelo notified the Debtor of his cancellation and recission of the contract to purchase the Sale Property. Meruelo asserts the Sixth Amendment materially and adversely impacts the Sale Property. Therefore, pursuant to Florida Statute § 718.503, Meruelo claims he has the right to cancel the contract without forfeiting the Escrow Deposit.[3] On June 30, 1999, Meruelo filed the Motion seeking return of the Escrow Deposit.

Meruelo contends the Sixth Amendment materially and adversely impacts the Sale Property under Florida Statute § 718.503 by (a) subjecting the use of the Sale Property to the governance of the Association, and (b) increasing the costs associated with Sale Property by including a provision that allows the Association to separately meter the utilities used in connection with the Commercial Units.

After comparing the Declaration of Condominium with the Sixth Amendment, the Court finds that the Sixth Amendment made no material and adverse changes to the Declaration of Condominium with respect to restrictions on the use of the Sale Property. In fact, the permitted uses for the Sale Property are unaltered by the Sixth Amendment. However, the Court is

---

**2.** The Sale Property physically existed on the date of the auction, but it did not legally exist as part of the condominium complex until the filing of the Sixth Amendment. *See, e.g., Florida Statutes §§ 718 et. seq.,* and the *Order Granting Debtor's Motion to "Unbundle" Unit 431 And to Authorize Kenneth Marlin, as Debtor's Authorized Representative, to Execute And Record The Sixth Amendment to The Declaration of Condominium* (C.P.453).

**3.** Notwithstanding the Confirmation Order which waived the right to cancel under Florida Statute § 718.503, the Debtor acknowledged during the trial on the Motion that the right to cancel under Florida Statute § 718.503 was revived upon the filing of the Sixth Amendment, which occurred after the entry of the Confirmation Order.

of the opinion that the Sixth Amendment did indeed make changes to the Declaration of Condominium which materially and adversely impacted the costs associated with the Sale Property. For the reasons that follow, the Court finds that Meruelo does have the right to cancel the contract to purchase the Sale Property pursuant to Florida Statute § 718.503, and is further entitled to the return of the Escrow Deposit.

## II. CONCLUSIONS OF LAW

In respect of the findings of fact stated above, as well as those stated during the hearing on the Motion, the Court makes the following conclusions of law.

### 1. *Jurisdiction*

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(N) and (O). The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334.

### 2. *The Right To Cancel Under Florida Statute § 718.503*

Florida Statute § 718.503 provides, in relevant part, that all contracts for the sale of a condominium unit shall contain the following language:

THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTIFICATION OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.

The proper analysis under Florida Statute § 718.503 turns on whether the developer's actions, as a matter of law, constitute an amendment which materially alters or modifies the offering in an adverse manner. *BB Landmark, Inc. v. Haber*, 619 So.2d 448, 449 (Fla. 3rd DCA 1993).

The plain meaning of Florida Statute § 718.503 requires the rescinding party to prove that the change was both material and adverse to the property purchased. *Oceania Joint Venture v. Trillium, Inc.*, 681 So.2d 881, 884 (Fla. 3rd DCA 1996). A material change is one that is "to a significant extent or degree." *BB Landmark*, 619 So.2d at 449, citing *The American Heritage Dictionary* 806 (New College ed.1981). An adverse change is "contrary to one's interests or welfare; unfavorable." *Id.*

The presumptive standard of proof in this matter is the preponderance of evidence standard. See, e.g., *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Preponderance of the evidence is the greater weight of evidence, such that when weighed with that opposed to it, the evidence supplied has more convincing force and is more probably true and accurate. *In re Stein*, 208 B.R. 209, 214 (D.Or.1997).

### 3. *The Sixth Amendment Did Not Change The Declaration Of Condominium With Respect To The Use Of The Sale Property*

It is inherent in the condominium concept that to promote the health, happiness, and peace of mind of the majority of the unit owners, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy over privately owned property. Condominium owners comprise a little democratic sub society of necessity more restrictive as it pertains to the use of condominium property than may be existent outside the condominium organization. *Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180, 182 (Fla. 4th DCA 1975). To effectuate this concept, condominium associations are permitted to promulgate rules governing the use of property within the complex. *Hidden Harbour Estates v. Basso*, 393 So.2d 637, 639 (Fla. 4th DCA 1981).

Florida case law is consistent with its statutes governing condominiums. Florida Statutes explicitly permit a condominium association to promulgate rules governing the use and operation of property within the condominium. *See,* e.g., *Florida Statutes §§ 718 et. seq.* For example, Florida Statutes provide that "[e]ach unit owner, . . . shall be governed by, and shall comply with the provisions of, this chapter, the declaration, the documents creating the association, and the association bylaws . . ." *Florida Statute §* 718.303(1).

The Declaration of Condominium at issue in this case specifically states that the units will be governed by the rules and regulations promulgated by the Association. The Declaration of Condominium provides in pertinent part:

> . . . [T]he Association shall have all of the powers and duties set forth in the Act, as well as all powers and duties granted to or imposed upon it by this Declaration, including, without limitation: . . . (g) The power to adopt and amend, upon a majority vote of the Board, rules and regulations covering the details of the operation and use of the Condominium Property. . . .

*Declaration of Condominium,* ¶ 11.1 "Condominium Property" is therein defined as ". . . the Land and personal property that is subjected to condominium ownership under this Declaration, all Improvements on the Land, and all easements and rights appurtenant thereto . . ." *Declaration of Condominium,* ¶ 2.14. Furthermore, other documents governing the building provide that the Association may make and amend reasonable rules and regulations governing the use and operation of the Condominium. *See,* e.g., *Articles of Incorporation,* Art. 5, ¶ 5.2(e); *By–Laws of the Association;* and the *Association's Rules and Regulations.*

In the Motion, Meruelo asks the Court to find the Sale Property was not subject to restrictions on its use imposed by the Association until the filing of the Sixth Amendment. *See,* e.g., *Motion,* generally. However, after reviewing the Declaration of Condominium, the By–Laws of the Association, the Articles of Incorporation of the Association, as well as the Association's Rules and Regulations,[4] and upon consideration of Florida law governing condominiums, the Court concludes that the operation and use of all property located within the Building (including the Sale Property) has always been subject to the rules and regulations promulgated by the Association. Therefore, the Court concludes that the inclusion of the phrase "however, consistent with the rules adopted by the Association" found in the Sixth Amendment did not alter, in any way, the Declaration of Condominium or permit the Association to impose greater restrictions on the use of the Sale Property. Any technical change to the Declaration of Condominium caused by the filing of the Sixth Amendment was not material or adverse to the Sale Property under Florida Statute § 718.503.

**4. *The Sixth Amendment Materially And Adversely Impacted The Sale Property By Increasing The Costs Associated Therewith***

■ At the hearing on the Motion, Meruelo also asked the Court to find the filing of the Sixth Amendment materially and adversely increased the costs associated with owning the Commercial Units thereby entitling Meruelo to cancel the contract pursuant to Florida Statute § 718.503. Meruelo argued that the owner of the Commercial Units was not obligated to pay for the utilities associated therewith until the filing of the Sixth Amendment. Meruelo concludes that the obligation to pay utilities has a material and adverse impact on the Sale Property.

---

**4.** All of which were contained within Debtor's Trial Exhibit 1 and available for the review and inspection of all parties that appeared and bid on the Sale Property on May 12, 1999.

Prior to the recording of the Sixth Amendment to the Declaration of Condominium of Seacoast 5151, Section 10 of the Declaration of Condominium, *Commercial Units*, was changed to add previously non-existent language. Specifically, the Sixth Amendment added the following language:

> "[t]he Association reserves the right to separately meter any Commercial Unit at the Association's expense whereupon the owner of the Commercial Unit shall be responsible for its own separately metered utilities without affecting his undivided interests in the Association's budget."

The proposed 1999 Annual Association Budget for Seacoast 5151 Condominium Association, Inc. was introduced into evidence by the Debtor on or about August 17, 1999. Specifically, the proposed 1999 Annual Association Budget for Seacoast 5151 Condominium Association, Inc. reveals that the metered utilities covered by the Association's Budget include: Cable Television, Electricity, Gas, Telephone, Trash Removal and Water and Sewer. As such, each unit owner at Seacoast 5151 Condominium received, as part of their maintenance payments, at no additional costs, Cable Television, Electricity, Gas, Telephone, Trash Removal and Water and Sewer. The proposed 1999 Annual Association Budget for Seacoast 5151 Condominium Association, Inc. specifically includes Phase I, Non-declared Phase II and the Commercial Units. There are 444 residential units and 6 commercial units, for a total of 450 units, at Seacoast 5151, who pay a proportionate share of these metered utilities based upon a percentage derived on the square footage of each individual residential or commercial unit. Under the Sixth Amendment, Meruelo, as owner of the Commercial Units is required to pay 2.60% [5] of the total metered utilities for Seacoast 5151 Condominium. As such, Meruelo is responsible to pay roughly $24,648.00 a year for metered utilities (2.6% × the total expenses for utilities of all the unit owners at Seacoast 5151 Condominium, which is $948,000.00). However, pursuant to the changes to the Declaration of Condominium in the Sixth Amendment, Meruelo could now also be responsible for Meruelo's own Cable Television, Gas, Telephone, Trash Removal and Water and Sewer, even though Meruelo will also pay Meruelo's proportionate share of utilities for each and every unit. Thus, for instance, while Ms. X, a hypothetical unit owner at Seacoast 5151 Condominium, would **only** be required to pay her monthly assessments, which would include her proportionate share of utilities, Meruelo would now be required to pay both $24,648.00 a year for metered utilities to cover all the units utilities and be required to pay for his own Cable Television, Gas, Telephone, Trash Removal and Water and Sewer.

With the changes in the Sixth Amendment, the **extra** amount of money that Meruelo would now be required to spend on Meruelo's own metered utilities (Cable Television, Gas, Telephone, Trash Removal and Water and Sewer) for the upcoming year is material and adverse. David Shear, the expert witness called by the Debtor to refute that the changes in the Sixth Amendment were "material" and "adverse", testified that he drafted the Sixth Amendment to the Declaration of Condominium, as well as the Condominium documents for Seacoast 5151, which include the proposed 1999 Annual Association Budget for Seacoast 5151 Condominium Association, Inc. Based upon the condominium's own budget figures, the changes made by the Sixth Amendment effectively obligate Meruelo to pay, at a minimum, an additional $12,168.00 [6] per

---

5. CU–1 (7431/531452) + CU–2 (758/531452) + CU–3 (2939/531452) + CU–4 (2939/531452) + CU–5 (1032/531452) + CU–6 (1046/531452) = Total (13858/531452) = .026 = 2.6%, which is the proportionate

share of common expenses to be paid by the owner of the Commercial Units.

6. The amount of $12,168.00 is 2.6% of $468,-000.00, which amount is the cost of utilities as set forth in the budget minus the annual

year for the utilities associated with the Sale Property, in addition to the $24,648.00 amount Meruelo was already obligated to pay for his proportionate share of the commercial units' utilities.

In *BB Landmark, Inc. v. Haber*, 619 So.2d 448 (Fla. 3d DCA 1993), the Third District Court of Appeals held that a one-time increase in the contractual price for "extras" from $10,384.00 to $17,122.00 was an **"adverse"** and **"material"** change by the developer and therefore the Third District Court of Appeals affirmed a summary judgment in favor of the buyer under Florida Statute § 718.503. Unlike the case in *Haber*, the Sixth Amendment to the Declaration of Condominium does not merely obligate Meruelo to a one time increase in utility charges, but potentially exposes Meruelo to an additional $12,168.00 in utilities charges for as long as Meruelo owns the commercial units. This obligation is in addition to the $24,648.00, which represents the proportionate share of the commercial units' utilities, which Meruelo is already obligated to pay.

In *Haber* the change would have been a one-time payment of less that $7,000.00. *Id.* In the instant case, Meruelo would be required to pay, at a conservative estimate (using Mr. Shear's budget), an extra charge of $12,168.00 for each and every year so long as Meruelo is the owner of the commercial units. For example, should Meruelo own the commercial units for ten (10) years, Meruelo would have to pay over $150,000.00 in extras as a result of the change to the Sixth Amendment. Florida Courts having concluded that a one time increase in the amount of less than $7,000.00 is a material and adverse change under Florida Statute 718.503, the argument is that much stronger in the circumstances of this case where the yearly increase appears to be greater than $12,000.00.

It is therefore—

**ORDERED and ADJUDGED** that Meruelo's Motion is GRANTED and Debtor shall refund the Escrow Deposit of $200,000.00.

electricity expense. (Because the Sixth Amendment originally obligated the owner of Commercial Units to pay for his/her own electricity, the utilities encompassed by the changes to the Sixth Amendment should only include Cable Television, Gas, Telephone, Trash Removal and Water and Sewer.)