**In re GULF NORTHERN TRANSPORT, INC., et. al., Debtors.**

**Lloyd T. Whitaker, Chapter 7 Trustee of UST Logistics, Inc., Plaintiff,**

v.

**J R Produce Corp., Defendant.**

**Bankruptcy No. 04–000175–3F7.**
**Adversary No. 04–79.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

March 16, 2006.

Richard J. Latinberg, for Plaintiff.

Tomas A. Pila, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This adversary proceeding came before the Court upon the Complaint filed by Plaintiff, Lloyd T. Whitaker, as Chapter 7 Trustee, on behalf of the bankruptcy estate of UST Logistics, Inc., d/b/a Checkmate Truck Brokerage, Inc. ("Checkmate"), seeking to collect on an alleged outstanding debt owed to Checkmate by Defendant, J.R. Produce Corp. ("J. R. Produce"). The trial of this adversary proceeding was held on October 6, 2005. In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence presented and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtor UST Logistics, Inc. formerly did business as Checkmate, a Florida corporation. (Compl. at 1.) Checkmate was a truck brokerage (Tr. at 40), which was licensed as a broker pursuant to 49 U.S.C. § 13102. (Compl. at 2.) J.R. Produce is a Florida corporation with a place of business in Hialeah, Florida (id.), of which Santiago Pereda ("Pereda") is the general manager (Tr. at 5.) and Raul Mendez ("Mendez") is the owner. (Tr. at 6.) Thunder Express was an agent or independent contractor hired by Checkmate to provide transportation services for which Checkmate was licensed.[1] (Tr. at 40–41.) Over the course of several months spanning from August to October of 2000, Thunder Express hauled inventory from J.R. Produce to various locations around the country (the "Transportation Services"). (Checkmate's Ex. 8.)

Checkmate filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 30, 2000 ("Petition Date"). (Compl. at 2.) Lloyd Whitaker was appointed trustee ("Trustee"). (Checkmate's Ex. 7.) Beginning approximately one month prior to the Petition Date, on or about October 31, 2000, and continuing through the beginning of December, on or about December 5, 2000, Mendez, on behalf of J.R. Produce, paid Thunder Express for the Transportation Services by written checks. (Checkmate's Exs. 3–6, 8.) Mendez, on behalf of J.R. Produce, made the following four payments to Thunder Express totaling $20,143.00 between October, 2000 and December, 2000:

| Load Dates | Date of Check | Check No. | Checkmate Invoice Nos. | Payee | Amount Paid |
|---|---|---|---|---|---|
| 11–Aug–00 | 31–Oct–00 | 7130 | 81377A | Thunder Express | $2,900.00 |
| 1–Sept–00, 22–Sept–00 | 7–Nov–00 | 7180 | 81724A, 82016A | Thunder Express | 5,800.00 |

---

1. In Checkmate's Post Trial Brief/Closing Argument, Checkmate claims that Thunder Express is a third party not bound to Checkmate by agency law. (Checkmate's Post Trial Br./Closing Argument at 5.) The Court finds, however, that an agency relationship did in fact exist, as evidenced at trial through testimony and through the application of law. A more detailed explanation follows below in the Conclusions of Law.

| | | | | | |
|---|---|---|---|---|---|
| 21–Aug–00, 29–Aug–00, 1–Sept–00, 5–Sept–00, 8–Sept–00, 8–Sept–00, 11–Sept–00 | 21–Nov–00 | 7267 | 81501A, 81648B, 81732B, 81737C, 81822B, 81839D, 81842D | Thunder Express | 6,163.00 |
| 6–Oct–00, 12–Oct–00, 23–Oct–00, 23–Oct–00 | 5–Dec–00 | 7326 | 82395A, 82482A, 82686D, 82688B | Thunder Express | 5,280.00 |
| 14–Aug–00 | N/A | N/A | 81389G | N/A | N/A[2] |

(Checkmate's Ex. 3–6, 8, Tr. at 33–35.)

On November 7, 2000, Checkmate and its affiliated companies[3] sent a form letter ("November 7 Letter") to "[a]ll Creditors of Checkmate ..." disclosing their financial difficulties which had forced them to "completely stop doing business." (Checkmate's Ex. 7.) J.R. Produce received one of these form letters.[4] (Tr. at 32–33, 35–37.) The letter disclosed specifically that Checkmate was "in the process of collecting [its] Accounts Receivable", and that certain former employees of Checkmate were no longer with the company and thus were "no way aligned with [it] to do business under any other name or method to avoid [its] financial responsibility to [the creditors]." (Checkmate's Ex. 7.)

On December 22, 2000, Checkmate, through the Trustee,[5] sent a letter ("December 22 Letter") to J.R. Produce which notified J.R. Produce that Checkmate had filed for relief under Chapter 11 of the Bankruptcy Code on November 30, 2000.(Id.) In this letter, Checkmate informed J.R. Produce that it had an outstanding account balance, for which payment needed to be sent to "Checkmate Truck Brokerage, Inc." (Id.) The December 22 Letter provided in pertinent part:

Payment on this account to any other address will prevent proper application of your funds .... YOU SHOULD ALSO BE ADVISED THAT THE PAYMENT OF YOUR OBLIGATION(S)

**2.** According to Checkmate's Exhibit 8, this transaction is unaccounted for in the evidence presented to the Court. The amount of this transaction is $264.00. (Checkmate's Ex. 8.)

**3.** Checkmate's affiliated companies were Maverick Truck Brokerage, Inc. and Prostar Truck Brokerage, Inc. (Checkmate's Ex. 7.) For the purpose of this analysis, the Court will refer solely to Checkmate with regard to this correspondence.

**4.** It is appropriate to note that J.R. Produce is considered an alleged debtor to Checkmate, and not a creditor. (Tr. at 36–37.)

**5.** Nearly all correspondence between December 22, 2000 to August 5, 2002 sent from Checkmate to J.R. Produce was through Trustee, Lloyd Whitaker. (Checkmate's Ex. 7.) Only a single Memorandum dated May 6, 2002 was sent by Shirley E. Borghi ("Borghi"), Trustee Representative, on behalf of Checkmate to J.R. Produce. (Id.) Therefore, unless otherwise stated, correspondence sent by Checkmate to J.R. Produce during this time frame will be assumed to have been sent through Trustee Lloyd Whitaker.

TO *ANY* PARTY OTHER THAN TO CHECKMATE TRUCK BROKERAGE, INC.... WILL SUBJECT YOUR COMPANY TO HAVING TO PAY THE OBLIGATION A SECOND TIME.

(Checkmate's Ex. 7)(emphasis in original). The December 22 Letter did not disclose the exact amount of the alleged outstanding debt that J.R. Produce owed to Checkmate. (Id.) After this letter, Checkmate sent five additional correspondence ("Additional Correspondence") to J.R. Produce requesting and demanding payment of this alleged outstanding debt.[6]

Albert Tickerhoof ("Tickerhoof") works for "the company hired by the trustee to do the accounts receivable" for Checkmate. (Tr. at 40.) Tickerhoof testified that the November 7 Letter put J.R. Produce on notice that it was to make all future payments to Checkmate, not any other party. (Tr. at 32, 35–36.) Upon cross-examination, however, Tickerhoof admitted that the November 7 Letter was addressed to Checkmate's creditors, and agreed that it "in no way instruct[ed] J.R. Produce to make checks payable to Checkmate." (Tr. at 37.) Furthermore, Tickerhoof agreed during testimony that it appeared that the December 22 Letter "gave the first instruction to J.R. Produce that the checks should have been made payable to Checkmate." (Id.) Tickerhoof also testified that according to his knowledge, there were no earlier communications in Checkmate's records that advised J.R. Produce to make checks payable to Checkmate only and no other party. (Id.)

Pereda testified that he was unaware of any involvement of J.R. Produce with Checkmate. Specifically, Pereda testified that he had not even heard of the name "Checkmate", as evidenced through the following testimony:

Q Mr. Pereda, you indicated that J.R. Produce had always done business with Thunder Express. Did J.R. Produce ever do business with Checkmate truck Brokerage?

A No.

Q Are you familiar with that name, Checkmate Truck Brokerage?

A After the claim, I got to know them.

Q So before the lawsuit was filed, is it your testimony that J.R. Produce was not familiar with the name Checkmate Truck Brokerage?

A That's how it is.

(Tr. at 7.) Yet Pereda also testified that, as evidenced in Checkmate's Exhibits 3–6, J.R. Produce acknowledged Checkmate on its checks by listing the word "Checkmate" and the corresponding invoice number. (Tr. at 10–12.)

Tickerhoof conceded during testimony that the Checkmate invoices did not specifically state that J.R. Produce was required to make its checks payable to Checkmate. To wit, testimony revealed the following:

Q ... So isn't it true that the words "make the check payable to Checkmate"

---

**6.** Checkmate sent a letter similar to the December 22 Letter to J.R. Produce on January 18, 2001. (Checkmate's Ex. 7.) Following that, Checkmate responded to an apparent inquiry from J.R. Produce with another similarly-styled letter on March 16, 2001.(Id.) Checkmate then sent a "Final Demand Letter" to J.R. Produce on December 7, 2001, outlining the same points as the prior correspondence. (Id.) On May 6, 2002, Borghi sent a Memorandum to Pereda at J.R. Produce referencing this same issue. (Id.) In this Memorandum, Broghi disclosed fifteen allegedly delinquent freight bills that J.R. Produce allegedly owed Checkmate. These freight bills totaled a $19,566.00 alleged outstanding debt J.R. Produce was to pay to Checkmate. (Id.) Finally, on August 5, 2002, Checkmate sent a "Final Demand for Payment" letter to J.R. Produce, seeking payment in the amount of $26,856.47. (Id.)

are not contained anywhere on [the Checkmate invoice]?

A Not specifically.

Q Okay. And to your knowledge, did anyone at Checkmate ever call J.R. Produce prior to December 22nd, 2000 and advise that they had all along been issuing the checks to the wrong person?

A I can't speak to that, sir.

. . .

Q And in your review of the records of Checkmate, did you ever come across any memorandum, notation, phone log, anything . . . that would indicate that at any moment in time [prior to December 22, 2000] someone from Checkmate had communicated to J.R. Produce that the way they were doing business was wrong and that they should have been making the checks payable to Checkmate?

. . .

A I have nothing about that [in] front of me.

(Tr. at 39–40.) In addition, Checkmate did not present any evidence that J.R. Produce had ever had any contact with Checkmate. (Tr. at 41–42.)

Pereda testified about his understanding of the workings of Checkmate as a truck brokerage with respect to J.R. Produce. According to Pereda, J.R. Produce conducted its business with Thunder Express. Pereda testified that Mr. Pastor Moreno ("Pastor") owned Thunder Express (Tr. at 13), and Pastor was the person who physically loaded the cargo onto his truck and actually performed the "Transportation Services." (Tr. at 13–14.) In other words, Pereda testified that "Thunder Express was the actual trucker who did the work," as evidenced on the Checkmate invoices. (Tr. at 14; Checkmate's Ex. 3–6.) Moreover, Pereda testified that "Checkmate is the truck broker. The truck broker does not do the work. The one who does the work is the owner of the truck. They must have some kind of commission . . . that they have to pay the truck broker . . . . Between them, there is some kind of agreement . . . ." (Tr. at 16–17.)

Tickerhoof also testified about Checkmate as a truck brokerage. According to his knowledge, Tickerhoof testified as follows:

Q Okay. Now, Checkmate was a truck brokerage; is that correct, sir?

A Yes, sir.

Q So there is no Mr. Checkmate, is there?

A No, sir.

Q And Checkmate doesn't own any of its own trucks; is that correct?

A Not to my knowledge.

Q So they use agents or independent contractors that do the actual hauling; is that correct?

A Yes, sir.

Q And in this case, Thunder Express was one of those; is that correct?

A Yes, sir.

(Tr. at 40–41.) Yet Checkmate also claims that Thunder Express is a third party unrelated to Checkmate. (Compl. at 5.)

Tickerhoof also testified that Checkmate does not have a written contract between Checkmate and J.R. Produce. Instead, Tickerhoof claimed that the bills of lading were evidence of a contract between Checkmate and J.R. Produce. (Tr. at 44.) And yet, Tickerhoof also admitted that he could not identify that any agent of J.R. Produce had signed any of the proffered bills of lading. (Tr. at 45.) At trial, no rebuttal testimony or any corroborative evidence was presented to show that J.R. Produce did in fact have a written contract with Checkmate. The only evidence of some sort of agreement came in the form of the invoice statements and bills of lad-

ing, which were not signed by any representative of J.R. Produce.

The evidence presented through Checkmate's Exhibits 3–6 show that J.R. Produce paid Thunder Express $20,143.00 by written checks, as presented in the table above. Pereda testified that these written checks paid for the Transportation Services provided to J.R. Produce. (Tr. at 15.) Tickerhoof also testified that these written checks show that Thunder Express had been paid:

> Q Because, you testified before, Checkmate had not been paid?
>
> A That's correct.
>
> Q ... But you now have in front of you the ... exhibits that have been entered into evidence, which are 3, 4, 5, and 6, that show those invoices being paid to Thunder Express; is that correct?
>
> A That—now? Yes. At the time we were doing our research, when the documents were brought to Jacksonville, this information was not–
>
> Q Okay.
>
> A —available.

(Tr. at 43.) Moreover, Checkmate did not produce any evidence showing that J.R. Produce had an outstanding balance with Checkmate prior to the Petition Date. Specifically, Tickerhoof testified as follows:

> Q Do you have copies of any statements from Checkmate to J.R. Produce showing outstanding balances prior to the bankruptcy petition being filed?
>
> A Not on—not in front of me, sir.

(Tr. at 46.) The only evidence with regard to the outstanding balance are the written checks accompanied by the Checkmate and J.R. Produce invoices (Checkmate's Ex. 3–6), the November 7 Letter, the December 22 Letter, and the Additional Correspondence sent from Checkmate to J.R. Produce (Checkmates Ex. 7).

Checkmate filed a four-count complaint seeking payment of this alleged outstanding balance with the Court on March 3, 2004. In its complaint, Checkmate sought to recover under theories of (i) breach of contract, (ii) account stated, (iii) unjust enrichment, and (iv) turnover of estate property pursuant to § 542 of the Bankruptcy Code. (Compl. at 3–5.) Under all theories of relief, Checkmate sought $36,003.68 for the alleged amount owed on the outstanding balance, the principal balance due, plus interest and costs. (Id.) On April 1, 2005, J.R. Produce filed an Answer and Affirmative Defense, denying such allegations and stating that J.R. Produce paid this alleged outstanding balance. (*See generally* Answer and Affirmative Defense.)

### CONCLUSIONS OF LAW

The instant case presents the Court with four issues. The first issue is whether J.R. Produce and Checkmate entered into a valid written contract and if so, whether J.R. Produce breached such contract or agreement. The second issue is whether J.R. Produce owes Checkmate for an alleged outstanding balance under a theory of account stated. The third issue is whether J.R. Produce has been unjustly enriched by a benefit Checkmate conferred on it. The fourth and final issue is whether J.R. Produce has property belonging to Checkmate's estate, which J.R. Produce must return pursuant to § 542 of the Bankruptcy Code. The Court will address each issue separately.

### A. *Count I—Breach of Contract*

 Florida law requires three elements for a finding of breach of contract: (i) the existence of a contract; (ii) breach of the contract; and (iii) damages. *Manuel v. City of Jacksonville (In re Blunt)*, 210 B.R. 626, 631–32 (Bankr.M.D.Fla.1997)(cit-

ing *Anthony Distribs., Inc. v. Miller Brewing Co.,* 941 F.Supp. 1567, 1574 (M.D.Fla. 1996)). More specifically, in order for a plaintiff to recover on a theory of breach of contract, "the plaintiff must prove by a preponderance of the evidence the existence of the contract, a breach of that contract, and damages flowing from the breach." *Official Comm. of Unsecured Creditors of Toy King Distrib., Inc. v. Liberty Sav. Bank, F.S.B. (In re Toy King Distribs. Inc.),* 256 B.R. 1, 156 (Bankr. M.D.Fla.2000) (citation omitted). A preponderance of the evidence is "the greater weight of evidence, such that when weighed with that opposed to it, the evidence supplied has more convincing force and is more probably true and accurate." *In re Suncoast Towers E. Assocs.,* 241 B.R. 476, 480 (Bankr.S.D.Fla.1999) (citation omitted). Based on the evidence presented, Checkmate did not prove the existence of a valid written contract that it had with J.R. Produce.

■ The Court finds that Checkmate has not proven by a preponderance of the evidence that J.R. Produce entered into a written contract with Checkmate for its services as a truck broker, for which Checkmate is licensed pursuant to 49 U.S.C. § 13102. (Tr. at 40; Compl. at 2.) According to 49 U.S.C. § 13102, a broker is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for ... transpor-

tation by motor carrier for compensation." 49 U.S.C. § 13102(2). Checkmate cannot point to a single document that memorializes J.R. Produce's intention of seeking Checkmate's services in finding a motor carrier to transport its produce. (Tr. at 43–45.) To the contrary, J.R. Produce insists that all of its communication has been with Thunder Express. (Tr. at 7.) Shippers can contract solely with carriers for their services. *See* 49 U.S.C. § 14101(b); *see also* "Motor Freight Brokers: A Tale of Regulatory Pandemonium," Jeffrey S. Kinsler, 14 N.W. J. Int'l L. & Bus. 289, 311 n.172 (Winter 1994).[7] It is very likely that J.R. Produce entered into a contract with Thunder Express pursuant to 49 U.S.C. § 14101(b)(1), which provides in pertinent part:

> A carrier providing transportation or service subject to jurisdiction under chapter 135 [49 USCS §§ 13501 et. seq.] may enter into a contract with a shipper, other than for the movement of household goods ... to provide specified services under specified rates and conditions.

Because Checkmate failed to produce even a scintilla of evidence that J.R. Produce contacted Checkmate in order to obtain the Transportation Services, it is simply unclear as to what definitively happened between these three parties. As a result, Checkmate failed to prove by a preponder-

---

**7.** A detailed discussion of the motor freight broker industry can be found in "Motor Freight Brokers: A Tale of Regulatory Pandemonium," Jeffrey S. Kinsler, 14 N.W.J. Int'l L. & Bus. 289 (Winter 1994). While the discussion predates the 1995 repeal of the Interstate Commerce Commission, Kinsler eloquently opines that "[m]otor freight brokers are the connecting link between shippers and carriers, uniting shippers who have cargo to deliver with carriers who have available motor transportation." *Id.* at 289 (footnote omitted). As a result, brokers "[a]ct[ ] in a traffic role for the shipper and in a sales role for the carrier." *Id.* at 294. Most importantly, for carriers, brokers can arrange for "backhaul" service, for which carriers can avoid returning to its home-base with an empty truck. *See id.* at 295. Thus, by utilizing a broker service, a carrier can "not only avoid the costs of returning empty, but also make a profit on the backhaul." *Id.* (footnote omitted)

ance of the evidence the existence of a contract.

■ In addition, Tickerhoof's testimony about the bills of lading is not enough to prove to the Court by a preponderance of the evidence the existence of a contract. A bill of lading, as defined by the Eleventh Circuit, is a document "signed by the carrier or his agent acknowledging that goods have been shipped on board a specific vessel that is bound for a particular destination and stating the terms on which the goods are to be carried." *Hale Container Line v. Houston Sea Packing Co.*, 137 F.3d 1455, 1462 n. 12 (11th Cir.1998)(quoting 2 Schoenbaum, § ·10–11 at 44 (2d ed.1994)). The Florida Supreme Court stated a similar definition, and further articulated that

> [t]he value of a bill of lading is found in the multiple roles that it plays: first, *it is the best evidence of the contract of carriage between the carrier and the seller;* second, it serves as the receipt for the goods under transport; and third, it is a document of title to property which can be endorsed and negotiated.

*King Ocean Cent. America, S.A. v. Precision Cutting Servs., Inc.*, 717 So.2d 507, 510 (Fla.1998) (citation omitted)(emphasis added). A contract of carriage is defined by 49 U.S.C. § 13102 as "service provided under an agreement entered into under section 14101(b)" for all transportation provided after December 31, 1995. 49 U.S.C. § 13102(4)(B).

As previously discussed, Checkmate did not prove the existence of a contract between J.R. Produce and Checkmate independent of the bills of lading and invoices. As a result, the bills of lading are simply the best evidence that there was a contract between Thunder Express and J.R. Produce pursuant to 49 U.S.C. § 14101(b)(1). *See King Ocean,* 717 So.2d at 510. By

themselves, the bills of lading do not prove by a preponderance of the evidence that J.R. Produce entered into a contract with Checkmate, a truck brokerage. At most, they are mere evidence that the goods were shipped to their final destinations through Thunder Express, as carrier.

■ Furthermore, Tickerhoof testified that there is no way of distinguishing that J.R. Produce signed the bills of lading. (Tr. at 45.) Checkmate could not prove, therefore, that any agent or representative of J.R. Produce signed the only evidence of the existence of a contract between J.R. Produce and Checkmate. "Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms. Mutual assent is an absolute condition precedent to the formation of a contract and without mutual assent, neither the contract nor any of its provisions come into existence." *In re Paxson Elec. Co.*, 248 B.R. 451, 461 (Bankr.M.D.Fla.2000). Without a signature from any agent of J.R. Produce on the bills of lading, there is no evidence that J.R. Produce mutually agreed to pay Checkmate for its brokerage services and not Thunder Express.

Moreover, Checkmate presented no evidence that J.R. Produce even orally agreed to pay Checkmate for the Transportation Services in lieu of Thunder Express. The only evidence Checkmate presented with regard to any contact between J.R. Produce and Checkmate during the course of the Transportation Services is reflected in the invoices and written checks. (Checkmate's Exs. 3–6.) The evidence presented by J.R. Produce, on the other hand, as Pereda testified, was that no one at J.R. Produce was even familiar with the name "Checkmate." (Tr. at 7.) On its face, the correlation between the Checkmate invoices and the written checks from J.R. Produce as evidence of an agreement be-

tween J.R. Produce and Checkmate, when weighed against Pereda's testimony, does not have "more convincing force" and is not "more probably true and accurate." *See Suncoast Towers,* 241 B.R. at 480. Instead, a very likely explanation could be that J.R. Produce had a contractual agreement with Thunder Express and merely included the Checkmate invoice numbers on their checks as a method of identification, without even recognizing that Checkmate was a truck brokerage which employed Thunder Express as an agent. With the record that faces the Court, there is simply no way of knowing for certain. As a result, Checkmate failed to prove by a preponderance of the evidence that a contract existed between J.R. Produce and Checkmate.

■ Finally, even if the Court could find that a valid contract existed between J.R. Produce and Checkmate, Checkmate did not prove by a preponderance of the evidence that J.R. Produce breached the contract. The evidence presented through Checkmate's Exhibits 3–6 show that J.R. Produce paid Thunder Express $20,143.00 between October 31, 2000 and December 5, 2000. (Checkmate's Exs. 3–6.) Pereda testified, and Tickerhoof admitted through his testimony, that J.R. Produce paid Thunder Express for the Transportation Services via those written checks. (Tr. at 15; Tr. at 43.) Tickerhoof admitted that prior to the Petition Date, Checkmate had not notified J.R. Produce of any outstanding balance owed to Checkmate. (Tr. at 46.)

According to the statutory definition of a broker, which is "a person ... that as a principal or agent sells, offers for sale, negotiates for ... transportation by motor carrier for compensation," 49 U.S.C. § 13102(2), Checkmate was either the principal or agent to Thunder Express. If Checkmate was the principal to Thunder

Express, which was employed as its agent, then J.R. Produce's payment to Thunder Express constituted payment to Checkmate. *See Mickler v. Maranatha Realty Assoc., Inc. (In re Mickler),* 50 B.R. 818, 827 (Bankr.M.D.Fla.1985)("[I]f an agency relationship is established, a payment to the agent is deemed to be a payment to the principal.")(citing *First National Bank v. Landress,* 112 Fla. 348, 150 So. 589 (1933)). If Checkmate was the agent to Thunder Express, then J.R. Produce's payment constituted full performance with respect to any contractual agreement between J.R. Produce and Thunder Express. In that case, J.R. Produce would be primarily liable to Thunder Express for the Transportation Services. *See Thunderbird Motor Freight Lines, Inc. v. Seaman Timber Co., Inc.,* 734 F.2d 630, 631–32 (11th Cir.1984)("[T]he general rule [is] that the shipper-consignor is presumed to be primarily liable to the carrier for freight charges on interstate shipment of goods.") (citation omitted). Even if J.R. Produce had paid Checkmate in that instance, Checkmate would merely act as a conduit and hold J.R. Produce's payments in a constructive trust for the benefit of Thunder Express. *See Transp. Revenue Mgmt. v. Freight Peddlers, Inc.,* 2000 WL 33399885, at *5 (D.S.C. Sept.7, 2000). Thus, in either case, J.R. Produce fully performed its obligation under any contract by making payment to Thunder Express.

The Court finds that Checkmate failed to meet its burden by proving the existence of a contract between J.R. Produce and Checkmate by a preponderance of the evidence. Assuming, however, the Court did find the existence of a contract, Checkmate still failed to prove by the preponderance of the evidence that J.R. Produce breached its contractual obligations to Checkmate. If Checkmate was the princi-

pal to Thunder Express, then the Court finds that J.R. Produce's payment to agent-Thunder Express constituted payment to principal-Checkmate. If Checkmate was the agent to Thunder Express, then the Court finds that J.R. Produce's payment to principal-Thunder Express satisfied its contractual obligations.

### B. *Count II—Account Stated*

 An account stated is "an agreement between persons who have had previous transactions, fixing the amount due in respect to such transactions and promising payment." *Nants v. F.D.I.C.,* 864 F.Supp. 1211, 1219 (S.D.Fla.1994) (citation omitted). "A plaintiff may prove a *prima facie* case for account stated by proffering evidence that the account was rendered under circumstances which raise a presumption of assent." *Id.* at 1220. "For an account stated to exist there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance." *First Union Disc. Brokerage Servs. v. Milos,* 997 F.2d 835, 841 (11th Cir.1993). "[T]he practice of periodic billing in the regular course of dealing may establish an account stated if no objection to the amount of the bill is made within a reasonable time." *Id.*

 A party's failure to object, standing alone, is not always proof of liability on the part of the defendant. "Under some circumstances, a failure to respond to a demand letter may support a finding of liability in an action for account stated; such an action is appropriate when parties engage in regular periodic billing." *Page Avjet Corp. v. Cosgrove Aircraft Serv., Inc.,* 546 So.2d 16, 18 (Fla. 3d DCA 1989). However, "[i]n an action for an account stated, failure to respond to a demand, without more, would not establish liability." *Id.* The Court finds, based on the facts in the record, that Checkmate failed to prove the elements for an account stated, and denies recovery based on this theory.

First, Checkmate has failed to prove that J.R. Produce agreed to pay *Checkmate* for the Transportation Services. According to Pereda's testimony, J.R. Produce had been working solely with Thunder Express, so any agreement for a correct balance due and a promise by J.R. Produce to pay could have been to Thunder Express. Besides the invoices and bills of lading proffered by Checkmate, there is no evidence of an agreement between Checkmate and J.R. Produce. "In the absence of such an agreement, no recovery upon an account stated theory is permitted." *F.D.I.C. v. Brodie,* 602 So.2d 1358, 1361 (Fla. 3d DCA 1992). As a result, the Court cannot permit Checkmate to recover for an account stated.

In addition, although Checkmate may have established a practice of periodic billing during the regular course of business, the record shows that J.R. Produce was not put on notice that they were supposed to pay *Checkmate* instead of Thunder Express until the December 22 Letter. (Checkmate's Ex. 7; Tr. at 37). This letter came after J.R. Produce had already paid Thunder Express in full for the Transportation Services. Moreover, the Checkmate invoices never directed J.R. Produce to pay Checkmate. (Tr. at 39–40.) As Tickerhoof admitted through testimony, the words "make the check payable to Checkmate" appeared nowhere on the Checkmate invoices. (Tr. at 39.)

The Court finds that Checkmate has failed to present a *prima facie* case for account theory on the evidence in the record. *See Nants,* 864 F.Supp. at 1220. Checkmate did not proffer evidence of an express or implicit promise by J.R. Produce to Checkmate to pay for a balance

124

deemed correct and due to Checkmate. *See First Union Disc. Brokerage Servs.*, 997 F.2d at 841. Without such an agreement, the Court cannot permit recovery for account stated. *See Brodie*, 602 So.2d at 1361. The Court, therefore, denies recovery to Checkmate under a theory for account stated.

### C. *Count III—Unjust Enrichment*

■ Under Florida law, for a plaintiff to succeed on a theory of unjust enrichment, the plaintiff must show: "(1) [plaintiff] conferred a benefit on [defendant] of which [defendant] is aware, (2) [defendant] voluntarily accepted and retained the benefit conferred, and (3) 'the circumstances are such that it would be inequitable for [defendant] to retain the benefit without paying for it.'" *Nova Information Sys., Inc. v. Greenwich Ins. Co., Nac,* 365 F.3d 996, 1007 (11th Cir.2004)(quoting *Shibata v. Lim,* 133 F.Supp.2d 1311, 1316 (M.D.Fla.2000)). For the following reasons, the Court finds that Checkmate has failed to prove a successful case for unjust enrichment.

■ "A claim for unjust enrichment is an equitable claim, based on a legal fiction created by courts to imply a 'contract' as a matter of law." *Tooltrend, Inc. v. CMT Utensili, SRL,* 198 F.3d 802, 805 (11th Cir.1999). In Florida, this theory is well recognized, and if someone does enrich himself unjustly to the detriment of another, that person "should be required to make restitution of all the ... benefits received, retained or appropriated when it appears to be just and equitable." *In re Munzenrieder Corp.,* 58 B.R. 228, 232 (Bankr.M.D.Fla.1986).

■ Checkmate has not shown that it conferred a benefit on J.R. Produce. As discussed previously in the Breach of Contract analysis, Checkmate failed to prove that it and not Thunder Express provided the Transportation Services to J.R. Produce. The Court cannot conclude that Checkmate even conferred a benefit to J.R. Produce. Assuming, however, that Checkmate did confer the benefit of the Transportation Services, the record is unclear whether J.R. Produce was even aware that Checkmate conferred the benefit. As aforementioned, J.R. Produce had never been notified that it should direct its payments to Checkmate until the December 22 Letter, which came *after* J.R. Produce had already paid Thunder Express for the Transportation Services.

■ "When a person retains money or benefits which in justice and equity belong to another, the theory of unjust enrichment may compel restitution." *Munzenrieder,* 58 B.R. at 232. Such is not the case here. J.R. Produce appears to have knowingly received a benefit from Thunder Express, to whom they then paid for such benefit. J.R. Produce, then, has not retained a benefit for which justice and equity compel payment to Checkmate. Thus, circumstances are not such that it would be inequitable, as J.R. Produce paid for the benefit received. *See Nova,* 365 F.3d at 1007.

■ Furthermore, restitution for unjust enrichment is only available provided that "the action involves no violation or frustration of law nor is it contrary to public policy either directly or indirectly." *Munzenrieder,* 58 B.R. at 232. It would clearly be contrary to public policy if purchasers of services were required to pay providers from whom they had received an unknown benefit. It would further frustrate public policy if these same purchasers were also required to pay twice for such an unknown benefit.

The Court finds that Checkmate has failed to show that it conferred a benefit on J.R. Produce. The Court also finds

that Checkmate has failed to show that if it conferred a benefit on J.R. Produce, that J.R. Produce was aware of such a benefit. Lastly, the Court finds that the circumstances do not justify restitution, as it would not be inequitable for J.R. Produce to retain the benefit. The Court finds that J.R. Produce paid for the benefit received, and it would frustrate public policy to force J.R. Produce to pay again without knowledge that a benefit was conferred on them, assuming *arguendo* that one was. As a result, the Court finds that Checkmate cannot recover from J.R. Produce under a theory of unjust enrichment.

### D. *Count IV—Turnover*

■■■■ Section 542 of the Bankruptcy Code permits a debtor to regain possession of property that properly belongs in the estate, so that the trustee may use, sell or lease the property pursuant to § 363 of the Bankruptcy Code. 11 U.S.C. § 542(a) (2004). This provision, however, refers only to "tangible property and money due to the debtor without dispute which are fully matured and payable on demand." *In re Olympia Holding Corp.*, 221 B.R. 995, 998 (Bankr.M.D.Fla.1998)(quoting *Charter Crude Oil Co. v. Exxon Co., U.S.A. (In re Charter Co.)*, 913 F.2d 1575, 1579 (11th Cir.1990)); *see also In re Paletti*, 242 B.R. 65, 66 (Bankr.M.D,Fla.1999)("[T]urnover is intended as a remedy to obtain what is acknowledged to be property of a debtor's estate."); *In re Advanced Telecomm. Network, Inc.*, 321 B.R. 308, 343 (Bankr.M.D.Fla.2005)("[A]ny right to turnover only arises upon entry of a judgment creating a right of recovery.") (citations omitted). It is not meant as a "remedy to determine the disputed rights of parties to property." *Paletti*, 242 B.R. at 66; *see also Olympia*, 221 B.R. at 998 ("[T]he purpose of the turnover provision is to provide debtors with the ability to

recover property, not the ability to recover property which *may be owed* to debtors.") (citation omitted)(emphasis in original); *Advanced Telecomm.*, 321 B.R. at 343 (Turnover "does not constitute an independent basis for recovery.").

■■■ Checkmate has failed to prove to the Court that J.R. Produce owes a debt to Checkmate under any theory stated in its Complaint. As a result, this claim cannot stand on its own, as the alleged debt has not fully matured and the Court has not entered any judgment creating a right of recovery in Checkmate. Checkmate cannot use this count alone to determine its rights to the debt in contention. Therefore, the Court finds that Checkmate has no entitlement to turnover of property, as the debt has not been found by the Court to be undisputed property of Checkmate's estate. The Court finds that Checkmate's claim for turnover of property pursuant to § 542 fails.

### *CONCLUSION*

Because Checkmate failed to prove to the Court that it is entitled to recovery under any theory stated in its Complaint, the Court holds that Checkmate is not entitled to payment by J.R. Produce of $36,003.68 representing the amount of the alleged debt plus interest and costs. A judgment in accordance with these findings of fact and conclusions of law will be separately entered.

### *JUDGMENT*

This adversary proceeding came before the Court upon the Complaint filed by Plaintiff, Lloyd T. Whitaker, as Chapter 7 Trustee, on behalf of the bankruptcy estate of UST Logistics, Inc., d/b/a Checkmate Truck Brokerage, Inc. ("Checkmate"), seeking to collect on an alleged outstanding debt owed to Checkmate by

Defendant, J. R. Produce Corp. ("J. R. Produce"). Upon findings of Fact and Conclusions of Law separately entered, it is

**ADJUDGED:**

1. Judgment is entered in favor of Defendant, J. R. Produce, and against Plaintiff, Checkmate as to Count I–Breach of Contract.

2. Judgment is entered in favor of Defendant, J. R. Produce, and against Plaintiff, Checkmate as to Count II–Account Stated.

3. Judgment is entered in favor of Defendant, J. R. Produce, and against Plaintiff, Checkmate as to Count III–Unjust Enrichment.

4. judgment is entered in favor of Defendant, J. R. Produce, and against Plaintiff, Checkmate as to Count IV–Turnover.